Citation Nr: 1550110 
Decision Date: 11/30/15 Archive Date: 12/04/15

DOCKET NO. 09-24 533 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Des Moines, Iowa


THE ISSUES

1. Entitlement to service connection for posttraumatic stress disorder (PTSD). 

2. Entitlement to service connection for an acquired psychiatric disorder other than PTSD.


REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESS AT HEARING ON APPEAL

Appellant


ATTORNEY FOR THE BOARD

P. Wirth, Associate Counsel


INTRODUCTION

The Veteran served on active duty from May 2001 to May 2004.

This case comes before the Board of Veterans' Appeals (Board) on appeal from a March 2008 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Des Moines, Iowa. In July 2009, the Veteran filed a timely Substantive Appeal (VA Form 9). 
 
In November 2009, the Veteran testified at a personal hearing over which a Decision Review Officer (DRO) of the RO presided. In June 2013, he testified at a personal hearing over which the undersigned Veterans Law Judge (VLJ) presided while at the RO. A transcript of each hearing has been associated with the Veteran's claims file. 

In an October 2013 decision, the Board found that new and material evidence had been received to reopen the Veteran's claims. The Board then remanded the claims for further development, primarily to afford the Veteran a VA examination.

This appeal was processed using the Virtual VA and Veteran Benefits Management System (VBMS) paperless claims processing systems. The June 2013 Board hearing transcript is contained in the Virtual VA file. Any future consideration of this Veteran's case should take into consideration the existence of both electronic records.



FINDINGS OF FACT

1. The Veteran served in Operations Enduring/Iraqi Freedom from January 2003 to June 2003; the Veteran engaged in combat with the enemy. 

2. The most probative evidence indicates that the Veteran does not meet the diagnostic criteria for PTSD.

3. The most probative evidence shows that an acquired psychiatric disorder other than PTSD, to include the chronic disorder of psychosis, was not affirmatively shown to have had onset during service, did not manifest to a compensable degree within one year of separation from service, and is not shown to be causally related to an injury, disease, or event of service origin.


CONCLUSIONS OF LAW

1. The criteria for establishing service connection for PTSD are not met. 38 U.S.C.A. §§ 1110, 5107(b) (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304 (2015).

2. The criteria for establishing service connection for an acquired psychiatric disorder other than PTSD are not met. 38 U.S.C.A. §§ 105, 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.301, 3.303, 3.304, 3.307, 3.309, 3.384, 4.9, 4.127 (2015). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

The Board has reviewed all of the evidence in the Veteran's claims file. Although the Board has an obligation to provide adequate reasons and bases supporting this decision, there is no requirement that the evidence submitted by the Veteran or obtained on his behalf be discussed in detail. Rather, the Board's analysis below will focus specifically on what evidence is needed to substantiate the Veteran's claims and what the evidence in the claims file shows, or fails to show, with respect to those claims. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000); Timberlake v. Gober, 14 Vet. App. 122, 128-30 (2000).

I. VA'S DUTY TO NOTIFY AND ASSIST

Before addressing the merits of the Veteran's claims, the Board is required to ensure that VA has satisfied its duties to notify and assist the Veteran in substantiating his claims for VA benefits, as provided for by the Veterans Claims Assistance Act of 2000 (VCAA). 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2015). 

In a December 2007 letter issued prior to the decision on appeal, the Veteran was provided with fully compliant VCAA notice with respect to his claims for service connection. 38 U.S.C.A. § 5103(a) (West 2014); 38 C.F.R. § 3.159(b) (2015); Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). The notice informed the Veteran of what evidence is needed to substantiate his claims for service connection, including what evidence must be submitted by the Veteran and what evidence will be obtained by VA. It also advised the Veteran of how disability evaluations and effective dates are assigned, and the type of evidence that impacts those determinations. 

VA also has a duty to assist the claimant in the development of a claim. This duty includes assisting the claimant in the procurement of service treatment records and pertinent post-service treatment records, and providing an examination when necessary. 38 U.S.C.A. § 5103A (West 2014); 38 C.F.R. § 3.159 (2015). VA must make reasonable efforts to assist a claimant in obtaining evidence, unless no reasonable possibility exists that such assistance will aid in substantiating the claim. 38 U.S.C.A. § 5103A(a) (West 2014).

VA has made reasonable efforts to obtain relevant records adequately identified by the Veteran. 38 U.S.C.A. § 5103A (West 2014); 38 C.F.R. § 3.159 (2015). Specifically, the information and evidence that have been associated with the claims file include the Veteran's service treatment records, service personnel records, voluminous VA medical records, VA examination reports, voluminous Social Security Administration (SSA) records, private treatment records, treatment records from a state-operated behavioral health hospital (C.B.H.H.), and the statements of the Veteran, his mother, and his representative. 

The Board notes that medical records for chemical dependency treatment referenced in the C.B.H.H. records have not been obtained. However, the Board finds there is no prejudice to the Veteran because of the lack of these records. The C.B.H.H. records describe the Veteran's course of treatment at the chemical dependency treatment facilities and show that, at times, the treatment at those facilities was very short, only a day or two, before the Veteran was returned to C.B.H.H. The Veteran has not requested that these treatment records be obtained or indicated that they are relevant to his claims. Moreover, the treatment records appear to relate only to ongoing chemical dependency treatment, which is well documented in the evidence of record. Thus, the Board finds that no further development is necessary to obtain these treatment records. 

The Veteran was afforded VA examinations in June 2006 and March 2009. The Veteran failed to report for a May 2012 VA examination. At his June 2013 Board hearing, the Veteran testified that he did not receive notice of the examination because the notice was sent to an old address. The Veteran added that he was willing and able to report for an examination. In June 2013, the Veteran's representative provided the Veteran's new address to VA. In October 2013, the Board remanded the Veteran's claims to afford him a new examination. The Veteran was scheduled for an examination in February 2014. 

The Veteran failed to report for the February 2014 examination. VA called the Veteran twice the day of the examination, but was unable to leave messages because the Veteran's voicemail was full. See February 2014 Report of General Information (VA Form 27-0820). 

A Supplemental Statement of the Case (SSOC) was mailed in February 2014 to the Veteran's last known address. The SSOC informed the Veteran that his claims were adjudicated based on the existing evidence of record because he failed to report for his February 2014 examination. The SSOC instructed the Veteran to respond in 30 days if he disagreed with the SSOC, and provided instructions on how to do so. 

In February 2014, the Veteran's representative submitted a request for expedited processing. The request acknowledged receipt of the SSOC, stated there was no additional evidence regarding the Veteran's appeal, and requested that the Veteran's case be forwarded to the Board immediately. 

"There is a presumption of regularity that attaches to the actions of public officials." Woods v. Gober, 14 Vet. App. 214, 220 (2000) (citations omitted). It has been held that there is a presumption of regularity that VA properly discharged official duties by mailing a copy of a VA decision to the last known address of the claimant and the claimant's representative, if any, on the date that the decision is issued. See Woods, 14 Vet. App. at 220-21 (2000); see also Mindenhall v. Brown, 7 Vet. App. 271, 274 (1994) (applying the presumption of regularity to official duties of the RO). 

The claimant may rebut that presumption by submitting clear evidence to the effect that VA's regular mailing practices are not regular or that they were not followed. See Ashley v. Derwinski, 2 Vet. App. 307, 309 (1992). Absent evidence that the claimant notified VA of a change of address and absent evidence that any notice sent to the claimant at his last known address has been returned as undeliverable, VA is entitled to rely on that address. See Cross v. Brown, 9 Vet. App. 18, 19 (1996).

As of this date, VA has not received any mail to the Veteran that has been returned as undeliverable. The Veteran also has not provided a statement indicating why he failed to report for the examination, as he did at his Board hearing when he did not receive notice of the VA examination. Moreover, the Veteran's representative has requested that the Board proceed with the Veteran's appeal. Thus, the Board finds that no further development needs to be taken to schedule the Veteran for a new VA examination. See Wood v. Derwinski, 1 Vet. App. 190, 193 (1991) ("The duty to assist is not always a one-way street. If a veteran wishes help, he cannot passively wait for it in those circumstances where he may or should have information that is essential in obtaining the putative evidence.") As such, the Board finds compliance with its October 2013 remand instructions. Stegall v. West, 11 Vet. App. 268, 271 (1998) (where the remand orders of the Board are not complied with, the Board errs as a matter of law when it fails to ensure compliance). Moreover, the Board observes that the present claim is a reopened claim. When a claimant fails to report for an examination scheduled in conjunction with an original compensation claim, the claim shall be rated based on the evidence of record. 38 C.F.R. § 3.655(b) (2015). When the examination was scheduled in conjunction with any other original claim, a reopened claim for a benefit which was previously disallowed, or a claim for increase, the claim shall be denied. Id. 

As previously noted, the Veteran was provided an opportunity to set forth his contentions during hearings before a DRO in November 2009 and the undersigned VLJ in June 2013. In Bryant v. Shinseki, 23 Vet. App. 488 (2010), the court held that 38 C.F.R. § 3.103(c)(2) requires that the hearing officer explain the issues and suggest the submission of evidence that may have been overlooked. Neither the Veteran nor his representative has asserted that VA failed to comply with 38 C.F.R. § 3.103(c)(2), or identified any prejudice in the conduct of the hearings. The hearings focused on the evidence necessary to substantiate the Veteran's claims for service connection. The Veteran, through his testimony, demonstrated that he had either actual knowledge of the evidence necessary to substantiate his claims, or that a reasonable person could be expected to understand from the notice what was needed. As such, the Board finds that, consistent with Bryant, the DRO and the VLJ complied with the duties set forth in 38 C.F.R. § 3.103(c)(2) and that any error in notice provided during the Veteran's hearings constitutes harmless error.

As discussed above, the Board has carefully considered VA's duties to notify and assist, and finds that they have been met. The Veteran has been provided with a meaningful opportunity to participate in the claims process and has been an active participant in it by providing evidence and testifying at hearings. Moreover, neither the Veteran nor his representative has identified any outstanding evidence that could be obtained to substantiate the Veteran's claims; the Board also is unaware of any such evidence. Any error in the sequence of events or content of the notices is not shown to have any effect on the case or to cause injury to the Veteran. Therefore, any such error is harmless and does not prohibit consideration of these matters on the merits. See Dingess v. Nicholson, 19 Vet. App. 473 (2006); see also ATD Corp. v. Lydall, Inc., 159 F.3d 534, 549 (Fed. Cir. 1998).

II. SERVICE CONNECTION

In this case, the Veteran asserts that he has PTSD and variously diagnosed psychiatric disorders that he contends are the result of his experiences in Iraq. The record reflects that the Veteran has been diagnosed under the general categories of substance-related disorders, attention-deficit disorders, schizophrenia and other psychotic disorders, mood disorders, anxiety disorders, and personality disorders.

The Veteran's Certificate of Release or Discharge from Active Duty (DD 214) shows the Veteran served in Operations Enduring/Iraqi Freedom from January 27, 2003 to June 4, 2003. His military specialty is listed as multiple launch rocket system crewmember. The Veteran states that he drove a truck that carried missiles. Service records show he was assigned to the 39th Field Artillery Battalion. In June 2009, the Joint Services Records Research Center (JSRRC) found that the Veteran participated in combat as defined in Pentecost v. Principi, 16 Vet. App. 124 (2002).

A. General Legal Criteria

Service connection is warranted where the evidence of record establishes that a particular injury or disease resulting in disability was incurred in the line of duty in active military service or, if pre-existing such service, was aggravated thereby. 38 U.S.C.A. §§ 1110, 1131 (West 2014); 38 C.F.R. § 3.303(a) (2015). Service connection also may be granted for any disease diagnosed after discharge, when all of the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d) (2015). 

Generally, in order to prove service connection, a veteran must show: (1) a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship, or nexus, between the present disability and the disease or injury incurred or aggravated during service. Holton v. Shinseki, 557 F.3d 1363, 1366 (Fed. Cir. 2009), (quoting Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004)).

Establishing service connection for PTSD generally requires: (1) medical evidence diagnosing PTSD; (2) credible supporting evidence that the claimed in-service stressor actually occurred; and (3) medical evidence of a link between current symptomatology and the claimed in-service stressor. 38 C.F.R. § 3.304(f) (2015); see also Cohen v. Brown, 10 Vet. App. 128 (1997).

A diagnosis of PTSD must be established in accordance with 38 C.F.R. § 4.125(a), which mandates that, for VA purposes, all mental disorder diagnoses must conform to the American Psychiatric Association's Diagnostic and Statistical Manual for Mental Disorders, Fifth Edition (DSM 5). See 38 C.F.R. § 3.304(f) (2015).

Previously, 38 C.F.R. § 4.125(a) provided that mental disorder diagnoses must conform to the American Psychiatric Association's Diagnostic and Statistical Manual for Mental Disorders, Fourth Edition (DSM-IV). The Board notes that the DSM-IV has been updated with the DSM 5. Effective August 4, 2014, VA issued an interim rule amending the portion of its Schedule for Rating Disabilities dealing with mental disorders and its adjudication regulations to refer to certain mental disorders in accordance with the DSM 5. 79 Fed. Reg. 45,093, 45,094 (Aug. 4, 2014). The provisions of the interim final rule, adopted without change in the final rule, only apply, however, to applications for benefits that are received by VA or that are pending before the agency of original jurisdiction on or after August 4, 2014, and do not apply to claims that have been certified for appeal to the Board, even if those claims are subsequently remanded to the agency of original jurisdiction. 80 Fed. Reg. 14,308 (March 19, 2015). Thus, the diagnostic criteria of the DSM-IV are applicable in the present case.

If the evidence establishes that the veteran engaged in combat with the enemy and the claimed stressor is related to that combat, in the absence of clear and convincing evidence to the contrary, and provided that the claimed stressor is consistent with the circumstances, conditions, or hardships of the veteran's service, the veteran's lay testimony alone may establish the occurrence of the claimed in-service stressor. 38 C.F.R. § 3.304(f)(2) (2015); see also 38 U.S.C.A. § 1154(b) (West 2014). The ordinary meaning of the phrase "engaged in combat with the enemy," as used in 38 U.S.C.A § 1154(b), requires that a veteran have participated in events constituting an actual fight or encounter with a military foe or hostile unit or instrumentality. The issue of whether any particular set of circumstances constitutes engagement in combat with the enemy for purposes of section 1154(b) must be resolved on a case-by-case basis. See VAOPGCPREC 12-99 (October 18, 1999).

Just because a physician or other health professional accepted a veteran's description of his or her service experiences as credible and diagnosed the veteran as suffering from PTSD, does not mean the Board is required to grant service connection for PTSD. Wilson v. Derwinski, 2 Vet. App. 614, 618 (1992). 

Certain chronic diseases, including psychosis, can be presumed related to service when a veteran has certain qualifying service and the chronic disease becomes manifest to a degree of 10 percent within one year from the date of separation from service. 38 U.S.C.A. §§ 1101, 1112, 1113, 1131, 1137 (West 2014); 38 C.F.R. §§ 3.307, 3.309 (2015). This presumption is rebuttable by affirmative evidence to the contrary. 38 U.S.C.A. § 1113 (West 2014). 

For VA purposes, "psychosis" means any of the following disorders listed in the DSM 5: (a) Brief Psychotic Disorder; (b) Delusional Disorder; (c) Psychotic Disorder Due to General Medical Condition; (d) Other Specified Schizophrenia Spectrum and Other Psychotic Disorder; (e) Schizoaffective Disorder; (f) Schizophrenia; (g) Schizophreniform Disorder; and (h) Substance/Medication-Induced Psychotic Disorder. 38 C.F.R. § 3.384 (2015).

However, previously 38 C.F.R. § 3.384 provided that a "psychosis" was a disorder listed in the American Psychiatric Association's Diagnostic and Statistical Manual for Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR). As indicated above, effective August 4, 2014, VA published an interim final rule that noted the DSM-IV-TR was outdated and replaced with the DSM 5. 79 Fed. Reg. 45,093 (Aug. 4, 2014).

The prior version of 38 C.F.R. § 3.384, which is applicable to the present case, defined "psychosis" as follows: (a) Brief Psychotic Disorder; (b) Delusional Disorder; (c) Psychotic Disorder Due to General Medical Condition; (d) Psychotic Disorder Not Otherwise Specified; (e) Schizoaffective Disorder; (f) Schizophrenia; (g) Schizophreniform Disorder; (h) Shared Psychotic Disorder; and (i) Substance-Induced Psychotic Disorder. 38 C.F.R. § 3.384 (2014).

For the showing of a chronic disease in service, there must be a combination of manifestations sufficient to identify the disease, and sufficient observation to establish chronicity at the time, as distinguished from merely isolated findings. 38 C.F.R. § 3.303(b) (2015). Section 3.303(b) equates the showing of a chronic disease in service "with a reliable diagnosis of the chronic disease while in service." See Walker v. Shinseki, 708 F.3d 1331, 1335 (Fed. Cir. 2013). For example, the regulation does not mean that any manifestation of joint pain in service will permit service connection of arthritis, first shown as a clearcut clinical entity, at some later date. 38 C.F.R. § 3.303(b) (2015). "To be 'shown in service,' the disease identity must be established and the diagnosis not be subject to legitimate question." See Walker, 708 F.3d at 1335. 

If there is no evidence of a chronic condition during service or the applicable presumptive period, then a showing of continuity of symptomatology from the time of service until the present may serve as an alternative method of establishing the second and/or third element of a service connection claim. 38 C.F.R. § 3.303(b) (2015). Medical evidence is required to demonstrate a relationship between a present disability and the continuity of symptomatology if the condition is not one where a lay person's observations would be competent. Clyburn v. West, 12 Vet. App. 296, 301 (1999). The theory of continuity of symptomatology in service connection claims is limited to those disabilities explicitly recognized as "chronic" by regulation, such as psychosis. See Walker v. Shinseki, 708 F.3d 1331, 1338 (Fed. Cir. 2013); see also 38 C.F.R. § 3.309(a) (2015).

For VA benefit claims filed after October 31, 1990, direct service connection may not be granted for disability resulting from a claimant's own drug or alcohol abuse. 38 U.S.C.A. § 105 (West 2014); 38 C.F.R. § 3.301(a) (2015). See also VAOPGCPREC 7-99.

However, alcohol or drug abuse disability acquired as secondary to, or as a symptom of, a service-connected disability can be service connected for compensation. See Allen v. Principi, 237 F.3d 1368 (Fed. Cir. 2001). A veteran must adequately establish, through clear medical evidence, that an alcohol or drug abuse disability is secondary to or caused by a primary service-connected disorder, and not due to willful wrongdoing. Id. at 1381. In addition, 38 U.S.C.A. § 1110 permits a veteran to receive compensation for an alcohol or drug abuse disability acquired as secondary to, or as a symptom of, a service-connected disability. Id. Compensation is precluded in only two situations: (1) for primary alcohol abuse disabilities; and (2) for secondary disabilities (such as cirrhosis of the liver) that result from primary alcohol abuse. Id. at 1376. Primary alcohol abuse disability means an alcohol abuse disability arising during service from voluntary and willful drinking to excess. Id.

The Board also notes that generally speaking, personality disorders, mental deficiency, mental retardation and other such "defects" are not "diseases" or "injuries" within the meaning of applicable legislation for VA disability compensation purposes and, therefore, cannot be service connected. 38 C.F.R. §§ 3.303(c), 4.9, 4.127 (2015). However, section 4.127 indicates that, as provided in 38 C.F.R. § 3.310(a), which concerns secondary service connection, disability resulting from a mental disorder that is superimposed upon mental retardation or a personality disorder may be service connected. See also VAOPGCPREC 82-90 (July 18, 1990); Carpenter v. Brown, 8 Vet. App. 240, 245 (1995); Quirin v. Shinseki, 22 Vet. App. 390 (2009). 

Defects are defined as "structural or inherent abnormalities or conditions which are more or less stationary in nature." VAOPGCPREC 82-90 (July 18, 1990). Congenital or developmental "defects" such as a personality disorder and mental deficiency automatically rebut the presumption of soundness and therefore are considered to have pre-existed service. 38 C.F.R. §§ 3.303(c), 4.9 (2015).

With respect to whether the Veteran engaged in combat with the enemy, the Board finds that the Veteran did engage in combat with the enemy. Therefore, relevant to this case is the relaxed evidentiary standard of proof afforded combat veterans under 38 U.S.C.A. § 1154(b) (West 2014). See Collette v. Brown, 82 F.3d 389 (Fed. Cir. 1996). That statutory provision directs that, when a disability is alleged to have been incurred or aggravated in combat, this element may be met through satisfactory lay evidence, consistent with the circumstances, conditions, or hardships of a veteran's verified combat service, even when there is no official record of the incident. Id. Significantly, however, 38 U.S.C.A. § 1154(b) does not establish a presumption of service connection; rather, it eases a combat veteran's burden of demonstrating the occurrence of some in-service incident to which the current disability may be attributed. See id. 

The United States Court of Appeals for the Federal Circuit further clarified that the section 1154(b) presumption can be used not just to show the incurrence of an event or injury, but to show that a veteran incurred a permanent disability in service. Reeves v. Shinseki, 682 F.3d 988, 999-1000 (Fed. Cir. 2012). In such cases, it may be far easier for a veteran to establish that there was a nexus between military service and the severe disability with which he or she was afflicted after leaving the military. Id. Instead of attempting to establish that the injury suffered while in the military led to a disability following his service, a veteran "would only have had to show that the [] disability he incurred in service was a chronic condition that persisted in the years following his active duty." Id. 

Notwithstanding, the Federal Circuit explained that "[e]ven when the section 1154(b) combat presumption applies, a 'veteran seeking compensation must still show the existence of a present disability and that there is a causal relationship between the present disability and the injury, disease, or aggravation of a preexisting injury or disease incurred during active duty.'" Id. at n.9. Thus, the reduced evidentiary burden only applies to the question of service incurrence, and not to the remaining service-connection elements of current disability and nexus.

The Board must assess the credibility and weight of all the evidence, including the medical evidence, to determine its probative value, accounting for evidence that it finds to be persuasive or unpersuasive, and providing reasons for rejecting any evidence favorable to the claimant. See Wilson v. Derwinski, 2 Vet. App. 614, 618 (1992); Hatlestad v. Derwinski, 1 Vet. App. 164 (1991). Equal weight is not necessarily accorded to each piece of evidence contained in the record; not every item of evidence necessarily has the same probative value.

Furthermore, in determining whether service connection is warranted for a disability, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the veteran prevailing in either event, or whether a preponderance of the evidence is against the claim, in which case the claim is denied. 38 U.S.C.A. § 5107 (West 2014); Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of the matter, the benefit of the doubt will be given to the veteran. 38 U.S.C.A. § 5107(b) (West 2014); 38 C.F.R. § 3.102 (2015). 

B. Background

The Veteran's April 2001 entrance examination shows a normal psychiatric evaluation. On his medical history, the Veteran specifically denied depression and excessive worry or nervous trouble of any sort. He reported that he went to a juvenile probation family counselor for about three months after he got in trouble at age 15. No other history of a mental health disorder or treatment is noted. 

In a May 2003 Post-Deployment Health Assessment, the Veteran denied concerns about possible exposures or events during the deployment that he felt might affect his health. He also stated that he did not intend to seek mental health care. 

Dental records show that the Veteran's lower right wisdom tooth was extracted in August 2003. Ten Percocet tablets were dispensed for pain, as well as 800 milligram Motrin tablets. Within 48 hours of the extraction, the Veteran presented to the emergency room complaining of excruciating pain, reporting he was taking only Motrin. A diagnosis of dry socket was provided and the Veteran was prescribed Percocet. The August 2003 emergency room record shows intact memory, normal mood, and judgment intact. 

September 2003 dental records show continued complaints of throbbing pain. The Veteran was prescribed Motrin. He complained of pain a second time in September 2003, but was not prescribed medication. In October 2003, the Veteran presented for dental treatment still complaining of throbbing pain. Radiographic interpretations revealed no abnormalities. The clinical evaluation showed that the site was healing well with no swelling. The diagnosis was idiopathic neuralgia. No medications were prescribed. It is noted that the Veteran had been given narcotics in the past and had come to somewhat rely on them. 

A November 2003 record shows the Veteran denied feeling down, depressed, or hopeless much of the time. He also denied that he had little interest or pleasure in doing things much of the time. 

The Veteran was seen in February and March 2004 for sores on his feet without mention of any mental health complaints. 

In April 2004, the Veteran complained of a "broken foot" due to a fall. The foot was edematous and ecchymotic. An x-ray examination of the right heel was normal. The Veteran was dispensed Percocet tablets. He returned complaining of pain and was dispensed Tylenol with codeine. The Veteran denied feeling down, depressed, or hopeless much of the time, and denied he had little interest or pleasure in doing things much of the time at these two visits. 

The Veteran separated from service in May 2004; however, neither a separation examination nor medical history is of record. The Veteran's DD 214 shows that the Veteran separated from service due to completion of his required active service. His re-enlistment code is 1, indicating that he was fully qualified for service when last separated from service and fully qualified for enlistment. Personnel records show the Veteran was not subject to any disciplinary actions during service.

In July 2004, the Veteran walked in to a VA clinic requesting help with depression. He was given an appointment for later that day; however, he did not return. 

At a September 2004 VA primary care visit, the Veteran sought treatment, in relevant part, for mood swings. He stated he was manic at times, and, as a kid, he thought he should have been put on Ritalin, but never was. 

An October 2004 VA mental health consultation shows the Veteran's chief complaint was that he had been drinking a lot. He also reported using methamphetamines, marijuana, opioids, and cocaine. He wanted to get off those, but wanted to get on medication for his mood. He started feeling extremely down when he tried to quit drugs and alcohol, and then ended up using again. He reported feeling down in the dumps for a long time. The Veteran also reported he had mood problems, mostly problems with depression, which started when he was around 17 or 18 years old. He started drinking and using marijuana around the age of 15, but it got heavy after he got back from Iraq in June 2003. Axis I diagnoses were mood disorder due to alcohol and polysubstance abuse; rule out major depressive disorder recurrent; alcohol dependence, methamphetamine abuse, marijuana abuse, and opioid abuse, all ongoing; and cocaine abuse, in early remission. 

The Veteran was found to be disabled for SSA disability purposes as of May 2005 with a primary diagnosis of anxiety related disorders, and a secondary diagnosis of personality disorders/conduct disorders. 

A June 2005 ASI-Addiction Severity Index, conducted during the Veteran's first VA substance abuse residential rehabilitation treatment program, shows the Veteran reported a substance use history as follows: alcohol to intoxication five years, methadone one year, other opiates/analgesics two years, cocaine two years, amphetamines three years, cannabis five years, hallucinogens one year, and multiple substances per day one year. 
 
June 2005 VA psychological testing showed anxiousness and psychotic symptoms. The Veteran's PTSD scale was consistent with PTSD, as specific to witnessing the death of a colleague in Iraq. 

A June 2005 VA discharge summary shows the Veteran reported that he had PTSD, but the practitioner noted that the Veteran did not appear to meet diagnostic criteria.

July 2005 VA records from the mental health addictions treatment program lists issues identified in current treatment to include rule out PTSD (anxiety PTSD versus the Veteran being scattered), mood disorder, and questionable psychosis. 

During a July 2005 VA neuropsychological evaluation for a possible attentional disorder, the Veteran reported being diagnosed with attention deficit hyperactivity disorder (ADHD) in high school and being placed on Ritalin. After comprehensive testing and evaluation, the following Axis I diagnoses were provided: ADHD, based in part on the Veteran's reported history of prior diagnosis of ADHD; alcohol and opioid abuse by history; and rule out depressive disorder not otherwise specified (NOS). The neuropsychologist stated that the results of the evaluation should be interpreted with a great deal of caution because the Veteran put forth variable amounts of effort. It was noted that the Veteran endorsed a variety of symptoms of depression and likely some depression was present. It was also noted that the Veteran had a tendency to over-report symptoms and throw out all sorts of psychological diagnoses for himself. No psychotic spectrum symptomatology was detected. What stood out most was the Veteran's fidgetiness and hyper behavior. 

An October 2005 VA psychiatric note shows that the Veteran reported an October 2004 hospitalization for acute alcohol intoxication, a June 2005 hospitalization for OxyContin detoxification, and a third hospitalization for suicidal threats, which were false but made because he had no other place to go. The assessment was depressive disorder NOS, rule out malingering, and cocaine and cannabis abuse.
A February 2006 VA discharge summary shows Axis I diagnoses of depressive disorder NOS, substance-induced mood disorder, and dependence of cocaine, alcohol, and marijuana. 

A June 2006 VA social work note shows that the Veteran reported he went through a VA PTSD program in July 2005. However, VA records show that the Veteran was deemed not appropriate for the PTSD program; rather, he went through a program to treat chemical addiction. 

A June 2006 VA psychiatric evaluation during an inpatient cocaine addiction treatment program shows that the Veteran reported he had been using drugs for several years. He also reported that his father introduced him to drugs and that he continued to use drugs while in the Army. The Axis I diagnoses were polysubstance abuse, PTSD by history, and psychotic disorder related to drug use. 

A later June 2006 VA treatment note during the cocaine addiction treatment program shows that the psychiatrist advised the Veteran that it was believed that his paranoia was a symptom of his illegal drug use; although, psychosis could not be fully ruled out. 

At the time of a June 2006 VA examination for PTSD, the Veteran was an inpatient in the cocaine addiction treatment program. The Veteran reported a traumatic combat experience in March 2003 when mortar rounds hit their positions killing a lieutenant, which the Veteran heard about over the radio. He also heard that a "bunch of people" in a different battery of the same battalion as the Veteran were killed in the attacks. The Veteran did not see any dead bodies. 

The examiner determined that the Veteran did not meet the DSM-IV criteria for PTSD. The Veteran was not involved in any actual threatened death and there was no serious threat to him. The examiner noted that the Veteran did have a vicarious trauma experience by proxy, but the symptom description was not consistent with how this would play out for Criterion B. The Veteran did not have flashbacks or symptoms that would be consistent with intrusive recollections, as they would relate to the proxy vicarious death of his lieutenant. The examiner found that the Veteran's nightmares were not consistent with the DSM-IV criteria for PTSD. The Veteran also did not meet Criterion C for a PTSD diagnosis. There was no indication of specific avoidance, constricted emotions, or restricted range of affect. The examiner noted that the Veteran had diminished interest in activities and was estranged from others due to his substance-induced mood and psychotic disorder. The Veteran did not have sleep disturbance. He exhibited hypervigilance in looking around the room in a nervous manner and reported startle reactions; however, the examiner attributed this to the Veteran's substance-induced mood and psychotic disorder. 

The examiner noted that VA records show PTSD by history, but there was no formal diagnosis of PTSD. The examiner diagnosed substance-induced mood and psychotic disorders, which appeared more likely than not to be residual and secondary effects from the chronic use of narcotic pain medications, cocaine, and alcohol. The examiner found that the history was not indicative of psychotic symptoms or mood disorder while the Veteran was on active duty. The examiner opined that the Veteran's depressive and anxious symptoms were related to the substance-induced mood and psychotic disorder, and not an independent diagnosis of an anxiety or mood disorder that would have a nexus to military service. 

A July 2006 VA psychiatric inpatient history and physical shows diagnoses of cocaine dependence continuous, severe; alcohol dependence continuous; amphetamine dependence in remission; cannabis dependence continuous; and opioid abuse in remission. The Veteran reported seeing dead and burnt bodies in Iraq, which contradicts what he reported at his June 2006 VA examination. 

A September 2006 initial psychiatry assessment at a state-operated behavioral health hospital, C.B.H.H., shows that the Veteran was being committed after he robbed a local coin store seeking money for alcohol. The Veteran admitted that he had significant problems since 1998 and that his psychiatric problems began then. He reported that he was introduced to LSD by his father and, since that time, had significant difficulties with polysubstances. In 2004, the Veteran was using amphetamines that he admitted made him feel paranoid and part of an experiment. The Veteran recently stole drugs from a dealer, which prompted him to move. It is noted that "[t]he [Veteran] does believe that he has [PTSD] as previously diagnosed at a VA Hospital." The Veteran reported that his drug use was the product of a government conspiracy and that the CIA was involved in "'psych warfare where they use drugs and alcohol to create super troopers.'" The history states that the Veteran was exposed to combat in Kuwait and Iraq while in the service. It continues that "[m]any of his psychiatric beliefs are related to his time spent in the service." The Axis I diagnoses were delusional disorder by history and polysubstance dependence, and the Axis II diagnosis was schizoid personality disorder by history. 

The October 2006 discharge summary by J.B., M.D. states that the Veteran had a long history of substance abuse going back at least seven years. It was noted that the Veteran did not have a history of psychiatric problems prior to returning from Iraq and the military. It notes that the Veteran refused to take part in groups and often saw himself as having significant chemical dependency problems secondary to PTSD from Iraq, but otherwise did not see himself as having psychiatric problems. The Veteran did not seem depressed during the hospitalization. It was noted that sleep medication helped with nightmares the Veteran had. There were no signs of psychosis at discharge. Final Axis I diagnoses were PTSD, polysubstance dependence, and history of substance-induced psychosis. The Axis II diagnosis was mixed personality disorder with paranoid and schizotypal features. 

An October 2006 initial psychiatry assessment by Dr. J.B. at C.B.H.H. states that the Veteran was a patient at the facility and was discharged on a committed basis to a different facility to continue treatment two days earlier, but did not like it there. The record continues that the Veteran was diagnosed during the prior hospitalization, in relevant part, with PTSD. The Veteran denied intrusive delusions; although, it was noted that he remained conspiratorial and proud of it. Dr. J.B.'s November 2006 discharge summary states that the Veteran was taking medication for hints of delusional material and for nightmares that seemed to be related to the PTSD. The Veteran never showed any psychotic symptoms. He was discharged with the same diagnoses as in October 2006. 

A December 2006 initial psychiatry assessment at C.B.H.H. by Dr. J.B. states that the Veteran had been diagnosed in the past with PTSD from his Iraq service. There was no significant depression or mania. He continued his beliefs about conspiracy, but did not show any clear delusional thinking. It is noted that his paranoid style made interactions difficult. Dr. J.B.'s December 2006 discharge summary states that the Veteran was "carrying diagnosis of PTSD" and more recently delusional disorder. Although the Veteran was not psychotic or depressed, he was mood labile and reactive. His medications were changed and he was less vocal about reporting his concerns about political events, terrorists, and nuclear weapons. The discharge Axis I diagnoses were PTSD, polysubstance dependence, and history of substance-induced psychosis. The Axis II diagnosis was mixed personality disorder with paranoid and schizotypal features. 

A March 2007 VA discharge summary shows an Axis I diagnosis of cocaine dependence. Axis II diagnoses were psychotic disorder substance induced and Cluster B personality traits, no formal diagnosis.

A July 2007 initial psychiatric assessment by Dr. J.B. at C.B.H.H. recounts that the Veteran's past three hospitalizations were usually caused by bizarre, threatening, and impulsive behaviors, but "it certainly seemed that chemical dependency issues and personality disorder issues were more significant than any psychotic or Axis I psychiatric illness." The Veteran reported significant psychiatric problems since 1998, at which point he was introduced to LSD by his father. It is noted that the Veteran "was in Iraq, came back reporting nightmares and other PTSD symptoms." Dr. J.B. notes that the Veteran spoke quickly and it "was hard to separate fact from hyperbole. The [Veteran] does seem to catastrophize most things in his life." He was not showing psychotic speech and denied depression. The paranoid ideations that were present in previous hospitalizations were not there now. The Veteran still had thoughts that bordered on nonreality thinking, but there were no clear delusions stated. Dr. J.B. states that the Veteran has been seriously ill with delusional beliefs and misperceptions for a long period of time. 

On the discharge summary four days later in July 2007, Dr. J.B. writes that the past hospitalizations usually involved paranoid statements that people saw as delusional, as well as impulsive actions and substance abuse. The Veteran did not show delusional thinking or paranoid ideation during the admission, which had been typical of past hospitalizations, or significant signs of depression or psychosis. The discharge Axis I diagnoses were PTSD chronic, polysubstance dependence, and history of psychosis secondary to substance abuse. The Axis II diagnosis was mixed personality disorder. 

A July 2007 private discharge summary from M.M.C. lists Axis I diagnoses of opiate withdrawal resolved; opiate dependence; major depressive disorder recurrent, moderate (however it is noted that it was hard to know how much of this was substance-induced mood disorder and that there was a strong anxiety component); PTSD by history; and alcohol dependence. The Axis II diagnosis was antisocial personality disorder with schizoid traits. 

A September 2007 private chemical dependency evaluation at M.M.C. shows that the Veteran reported being diagnosed with depression, antisocial personality, possible bipolar condition, schizoaffective disorder, and addiction to sex. Although the Veteran did not report a diagnosis of PTSD, it is noted there were possible concerns of PTSD due to six months the Veteran spent in Iraq while in the military. 

In September 2007, the Veteran appeared at VA demanding opiate medication and threatened to kill himself if he did not get his medication. 

An October 2007 private chemical dependency evaluation at M.M.C. states that it was very difficult to get information considered completely reliable from the Veteran. An October 2007 discharge summary lists his Axis I diagnoses as adjustment disorder with disturbances of mood and conduct, and polysubstance abuse, including alcohol and opiates. His Axis II diagnosis was antisocial personality disorder, and it is noted that this was the Veteran's primary problem. It is also noted that the Veteran was very manipulative and that his behavior was very inconsistent. 

A November 2007 private discharge summary for a different hospitalization at M.M.C. lists the Veteran's Axis I diagnoses as bipolar disorder and polysubstance abuse, including opiate and alcohol abuse. The Axis II diagnosis is antisocial personality. 

In November 2007, the Veteran applied for VA's PTSD Residential Rehabilitation Program. The Veteran was informed that he was not a good fit for the program because of aggressive behaviors noted in his records. The Veteran stated that those were lies fabricated by some doctors to prevent him from getting VA services. The Veteran reported that he had been diagnosed with PTSD. When asked why he wanted in to the program, assuming the diagnosis was accepted, the Veteran responded that he heard veterans get 100 percent payment while in the program and he wanted the money. 

A January 2008 VA mental health note shows that the Veteran reported he began having mental health problems after he was discharged from the Army. The Veteran also reported that his heavy drug use, including use of LSD and ecstasy, may have contributed to his mental health problems, but he also believed his experiences in Iraq were a factor. 

An April 2008 discharge summary from the St. Cloud VA lists Axis I diagnoses of alcohol dependence, opiod dependence (principal diagnosis), mixed substance dependence, and anxiety disorder NOS (PTSD features). The Axis II diagnosis was personality disorder NOS. 

In an October 2008 admission note at M.M.C., the physician states that the Veteran ran out of opiates and was in detoxification. The physician continues that "[f]rom prior history, [he knew] that [the Veteran] ha[d] a great deal of difficulty speaking the truth." The Veteran reported depressed mood with feelings of hopelessness. It is noted that the Veteran appeared to be medication seeking. The Veteran reported that he was using large quantities of Methadone that he was purchasing from an elderly woman. The physician found no evidence of psychosis. Axis I diagnoses were polysubstance dependence (primarily opiates), possible opiate withdrawal, and probable organic mood disorder. The Axis II diagnosis was antisocial personality disorder. 

A November 2008 VA discharge summary shows that the Veteran reported being unemployed, but that he received disability for PTSD. The note includes an Axis I diagnosis of PTSD based on the Veteran's report that he remembered being diagnosed with PTSD in 2006. 

The Veteran's mother states in October 2008 that the Veteran never used alcohol, tobacco products, prescription drugs, or street drugs prior to his military service, and that he was emotionally stable prior to service. She states that after service the Veteran was drinking heavily and smoking, and was unable to hold a job. His emotional status deteriorated severely. He was very anxious, delusional, and woke with nightmares. He believed that everyone was conspiring against him. 

A February 2009 private neuropsychological evaluation shows that the Veteran reported that there may be a family history of mental illness, as he believed that his father was paranoid, and perhaps schizoaffective. He reported that he never drank alcohol before the service, but, after his discharge, he would consume a half gallon of vodka and pain killers. The Veteran acknowledged being moderately depressed. After testing, the psychologist summarized that the evaluation indicated that the Veteran met the diagnostic criteria for schizoaffective disorder, bipolar type; PTSD by history; polysubstance abuse; and a cognitive disorder NOS. From a cognitive standpoint, the Veteran was estimated to be of low average intelligence, with many of his cognitive skills of a similar level. His memory was varied and he had considerable problems sustaining attention. From an emotional standpoint, the Veteran presented with significant levels of psychopathology, including paranoid thinking, racing thoughts, depression, anxiety, and social withdrawal. 

A February 2009 VA mental health note states that the Veteran was an unreliable historian due to inconsistent history and drug seeking behavior. The Veteran denied psychotic, manic symptoms. Axis I diagnoses were mood disorder due to alcohol and polysubstance abuse; and alcohol dependence, methamphetamine abuse, marijuana abuse, opioid abuse, and cocaine abuse, all in early remission. 

A March 2009 VA psychiatry note shows that the Veteran was in a private methadone maintenance program.

At a March 2009 VA examination for PTSD, the Veteran reported that his primary duties in Iraq were participating in convoys as the driver for an ammunition truck. The Veteran mentioned the loss of his platoon leader, a lieutenant, as a specific casualty. The Veteran stated that the lieutenant's death was the result of a friendly fire incident that was covered up by attributing it to a grenade attack. The Veteran heard about the lieutenant's death by radio and did not describe particular horror or dread resulting from learning about it. 

With respect to PTSD symptoms, the Veteran reported daily intrusive thoughts regarding his combat experiences, as well as combat-related dreams once per week. However, he had difficulty identifying any cues that recalled combat experiences for him. Eventually, he indicated that hearing gunshots in his neighborhood may trigger some recollection, but did not result in physiological reactivity. The Veteran reported that his medications and substance abuse were the means that he used to avoid thoughts regarding his combat experiences. He did not avoid conversations regarding his combat experiences or avoid activities reminiscent of his combat experiences. There was some indication of possible restricted affect. The primary arousal symptoms reported by the Veteran were irritability, hypervigilance, and possible exaggerated startle response; although, he described these behaviors as reactions to living in an unsafe neighborhood. 

The Veteran indicated that he first drank alcohol at the age of 15, denied excessive drinking during his military service, and stated that he began drinking alcohol excessively after Iraq and continued heavily for two years. He subsequently abused pain medications, including Vicodin, which were initially prescribed for him following the removal of wisdom tooth and for a leg injury. He reported experimenting with cocaine, methamphetamine, and marijuana. He stated that he was diagnosed with ADHD approximately 20 years ago, and benefited from treatment with Ritalin at that time. He had been abstinent from illicit drugs and alcohol since November 2008. 

The Veteran described himself as paranoid; although, there was no indication of an acute disturbance of thought process. He subjectively described himself as depressed, but reported very few vegetative or other specific symptoms of depression. He acknowledged some history of panic attacks and reported emergency room treatment in 2006 in regard to panic attacks. The Board notes, however, that there is no evidence of complaints or treatment regarding panic attacks in or about 2006. 

The examiner notes that, between 2006 and 2008, the Veteran was admitted to VA hospitals at least 12 separate times, and that, at more than one time, the opinion was expressed that the Veteran was malingering symptoms in order to receive shelter. The Veteran received a number of diagnoses, but the most common diagnosis was polysubstance abuse or dependence. Additional diagnoses were bipolar disorder or schizoaffective disorder, as well as diagnoses of Cluster B personality disorder diagnoses or traits. The examiner notes that a November 2008 discharge summary from the Iowa City VA Medical Center included a diagnosis of PTSD, but the specific stressor engendering PTSD was not indicated. The hospitalization was for suicidal ideation related to narcotics withdrawal. (The Board notes that the PTSD diagnosis appears to be based on the Veteran's reported diagnosis of PTSD.) The examiner also notes that, prior to the hospitalization at the Iowa City VA Medical Center, PTSD had been indicated only at a treatment episode at the St. Cloud VA in 2008 and an unsigned and undated partial document for which the location of the treating facility was not identified. 

The examiner notes that the Veteran reported sufficient symptoms of PTSD to meet diagnostic criteria for the diagnosis, but a specific verifiable stressor could not be identified. However, the examiner opines that the Veteran's presentation and symptoms were much more clearly consistent with psychotic disorders, either delusional disorder, schizoaffective disorder, or psychosis secondary to substance abuse. The Axis I diagnoses rendered were schizoaffective disorder, rule out other (or unknown) substance-induced psychotic disorder with delusions, and history of polysubstance dependence, reportedly in early full remission. The Axis II diagnosis was Cluster B personality traits by records, not noted in the present examination.

In an April 2009 addendum report, the VA examiner noted that the Veteran was honorably discharged in May 2004, experienced psychiatric difficulty as early as October 2004, and began abuse of pain medication probably prior to October 2004. Based on the limited likelihood that the Veteran's primary substance abuse of pain medications would result in psychotic symptoms and indications in the Veteran's records that the Veteran's father also experienced schizophrenia or schizoaffective symptoms, the examiner opined that the Veteran began to display psychotic symptoms due to primary psychosis, and the Veteran's first treatment followed soon enough after his discharge to support an assumption that some schizoaffective disorder was present during his military service; although, symptoms may not have been sufficient to require treatment and the diagnosis was masked by the Veteran's known substance abuse. However, the examiner stated that this opinion was speculative and that he found insufficient evidence to support or refute it. He noted that the family history of psychosis was based only on the Veteran's report and that, due to his own psychosis, the Veteran was not a reliable historian.

A June 2009 VA pharmacy medication management consultation note states that the Veteran had been abstinent of alcohol for at least four days. A July 2009 VA record shows that the Veteran reported he had not used since March 2009 and felt that the Methadone was really helping. The Board notes, however, that the Veteran reported in his June 2009 VA examination that he had been abstinent from illicit drugs and alcohol since November 2008, which was clearly not the case.

An October 2009 VA psychiatry note shows that the psychiatrist agreed with the March 2009 VA examiner's diagnosis of schizoaffective disorder. The psychiatrist notes that the Veteran had been free of substance abuse for several months, but the psychiatrist had seen essentially no change in the Veteran's mental state attributable to substances. The psychiatrist states that elements of paranoia continue to interfere with the Veteran's life and decisions.

In November 2009, the Veteran testified at a hearing before a DRO that his PTSD symptoms began right at the being of the war on March 20, 2003. He had a lot of fear of injury, death, and possible destruction of the planet. He felt like death was imminent at any second. He also testified that he noticed symptoms, even before he was deployed, due to just knowing that he was going to the war. 

The Veteran did not seek treatment in service because he was led to believe that he could not get treatment. He told his commander that he did not want to re-enlist because he had a drinking problem and was on prescription pain pills at that time because of his leg. "[T]hey" did not let him get help and he was scared to get help. He sought treatment in October 2004 from VA. 

The Veteran testified that previously he was using drugs on very rare occasions for only a few minutes. He did not drink every day before he went to Iraq, but he started to drink heavily every day after he got back from Iraq. The Veteran testified that he had not used any drugs in the last year, which, as noted above, was not the case, and that he was as stressed out as ever and still had PTSD. He did use alcohol every night to mask the symptoms. 

The Veteran reported that he had nightmares and every one of the symptoms of PTSD. The Veteran testified that he had no psychiatric problems prior to his military service, and that all of his problems began in 2003 and are linked to Iraq. 

An April 2010 VA psychiatry note states that Methadone maintenance keeps the Veteran from using illicit opioids. The Veteran denied alcohol craving or use; however, this is inconsistent with his November 2009 testimony at the DRO hearing that he used alcohol every night. It is noted that the medication regiment controlled the Veteran's symptoms; although, he persisted in some conspiracy theories and hyperverbality. Axis I diagnoses were schizoaffective disorder and opioid abuse in remission.

From about 2012, VA records reflect difficulties contacting the Veteran, several "no shows" for appointments, and concerns of the Veteran regarding VA payment for his Methadone. However, there are records from two VA psychiatry appointments.

An August 2012 VA psychiatry note shows that the Veteran reported anxiety and insomnia, and waking up if he had withdrawal symptoms from Methadone. He was not depressed and there was no evidence of psychosis. Axis I diagnoses were opioid abuse in remission, schizoaffective disorder, and polysubstance dependence in remission. 
A February 2013 VA psychiatry note shows that the Veteran reported doing well and denied use of alcohol or illegal drugs. He wanted to continue the private Methadone program. He had no symptoms of depression or anxiety, and denied hallucinations or delusions. He reported nightmares and flashbacks of the war. He also reported watching a lot of television that brought back memories of the war. Axis I diagnoses were opioid abuse in remission, schizoaffective disorder, and polysubstance dependence in remission.

At the June 2013 Board hearing, the Veteran testified that in March 2003 in Iraq he recalled a time that incoming mortars landed about 300 meters from his truck. No one was killed or injured and he "wasn't scared to death," "but it was weird." Hearing Transcript at 4-5. Everything was all good with his mental health up to that point, even after that point. Then, in about two weeks, it was major combat operations and "just a lot of weird stuff going on." Id. at 5. 

After he got back from Iraq, he got addicted to cigarettes and alcohol. Id. at 6. He was very unstable after he got out of service and in VA facilities in six different states. Id. at 7. He was constantly moving and related everything to the "weird stuff" he went through in Iraq. Id. at 8. He testified that he is still not back all the way, but has been stable on his medication. He had not "been moving around all over the country flipping out." He was trying to get part-time work. Id. at 9. The Veteran testified that he was diagnosed with PTSD right when he got out of service. Id. at 11. 

C. Analysis

Personality Disorder

Personality disorders cannot be service connected. 38 C.F.R. § 3.303(c) (2015). 
Rather, disability resulting from a mental disorder that is superimposed upon a personality disorder may be service connected. VAOPGCPREC 82-90 (July 18, 1990). However, in the present case, there is no credible persuasive evidence of any mental disability that is superimposed upon the Veteran's personality disorders. 
The Board notes that, in its October 2013 remand for a VA examination, the Board sought guidance from the VA examiner concerning whether the Veteran suffers additional disability because of superimposed disease; however, the Veteran failed to report for his February 2014 VA examination. Evidence expected from this examination, which might have been material to the outcome of the claim, could not be considered. The Veteran's psychiatric picture is medically complex and requires a medical professional with expertise in evaluating psychiatric disorders to sort out the diagnoses and determine the etiologies of the diagnoses. Therefore, entitlement to service connection for a superimposed disability is not substantiated. 

PTSD

As noted above, the Board finds that the Veteran engaged in combat with the enemy. The Board finds further that the Veteran's claimed PTSD stressors are consistent with the circumstances, conditions, or hardships of his service. Therefore, the Veteran's lay testimony alone may establish the occurrence of the claimed in-service stressors, and in-service stressors for PTSD are conceded for the Veteran. To the extent that the Veteran's statements may be construed that he had PTSD in service which persisted in the years following his service, regardless, the Board finds that the most probative medical evidence reveals that the Veteran does not currently meet the diagnostic criteria for PTSD. 

Service treatment records are negative for any complaints, diagnoses, or treatment of PTSD. In a May 2003 Post-Deployment Health Assessment, the Veteran specifically denied concerns about possible exposures or events during the Iraq deployment that he felt might affect his health. An August 2003 emergency room record shows intact memory, normal mood, and judgment intact. A November 2003 and two April 2004 records show the Veteran denied feeling down, depressed, or hopeless much of the time, and denied he had little interest or pleasure in doing things much of the time. The Veteran was honorably discharged from service and found qualified to re-enlist.

The Board finds it highly probative that, despite more than a dozen VA hospitalizations, two VA examinations, and nearly a decade of treatment, the Veteran has not been formally diagnosed with PTSD by any VA practitioner in accordance with the DSM-IV diagnostic criteria. 

A June 2005 VA discharge summary shows that the Veteran reported he had PTSD, but the practitioner noted that the Veteran did not appear to meet the diagnostic criteria. July 2005 VA records show anxiety PTSD versus the Veteran being scattered is to be ruled out. A July 2005 VA neuropsychological evaluation resulted in diagnosis of ADHD, but not PTSD. 

The Board finds the opinion of the June 2006 VA examiner to be highly probative to the questions at hand. The examiner found that the Veteran did not meet the DSM-IV criteria for a diagnosis of PTSD; instead, the examiner diagnosed the Veteran with substance-induced mood and psychotic disorders. The examiner found that the Veteran's symptom description was not consistent with PTSD criteria. The Veteran did not have flashbacks or symptoms that would be consistent with intrusive recollections; the Veteran's nightmares were not consistent with the DSM-IV criteria for PTSD; and there was no indication of specific avoidance, constricted emotions, or restricted range of affect. To the extent that the Veteran exhibited diminished interest in activities, was estranged to others, exhibited hypervigilance, and reported startle reactions, the examiner specifically attributed these symptoms to the Veteran's substance-induced mood and psychotic disorder. 

Similarly, the March 2009 VA examiner did not ultimately diagnose the Veteran with PTSD. The examiner opined that the Veteran's presentation and symptoms were much more clearly consistent with psychotic disorders, either delusional disorder, schizoaffective disorder, or psychosis secondary to substance abuse, than PTSD. The examiner noted that the Veteran reported daily intrusive thoughts regarding his combat experiences, as well as combat-related dreams once per week. However, the Veteran had difficulty identifying any cues that recalled combat experiences; did not avoid conversations or activities reminiscent of his combat experiences; and attributed irritability, hypervigilance, and possible exaggerated startle response to living in an unsafe neighborhood. The examiner also noted that the Veteran's reporting did not appear accurate. For example, the Veteran described himself as paranoid, but there was no indication of an acute disturbance of thought process. He described himself as depressed, but reported very few vegetative or other specific symptoms of depression. The examiner noted that, at more than one time, the opinion was expressed in VA records that the Veteran was malingering symptoms in order to receive shelter. In addition, the examiner noted that the Veteran's VA records did not include a clear diagnosis of PTSD in accordance with the DSM criteria.

The Board acknowledges that Dr. J.B. of C.B.H.H. listed an Axis I diagnosis of PTSD for the Veteran in October 2006. The probative value of medical opinion evidence is based on the medical expert's personal examination of the patient, his or her knowledge and skill in analyzing the data, and his or her medical conclusion. As is true with any piece of evidence, the credibility and weight to be attached to these opinions are within the province of the adjudicator. Guerrieri v. Brown, 4 Vet. App. 467, 470-71 (1993). Whether a physician provides a basis for his or her medical opinion goes to the weight or credibility of the evidence in the adjudication of the merits. See Hernandez-Toyens v. West, 11 Vet. App. 379, 382 (1998). Other factors for assessing the probative value of a medical opinion are the physician's access to the claims folder and the thoroughness and detail of the opinion. See Prejean v. West, 13 Vet. App. 444, 448-49 (2000). 

An adequate examination requires that the examiner providing the report or opinion be fully cognizant of the veteran's past medical history. Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 301 (Vet. App. 2008). There is no evidence of record that Dr. J.B. reviewed the Veteran's service treatment records or his VA treatment records. Thus, Dr. J.B. was basing his opinion solely on the Veteran's reported history. 

If Dr. J.B. had reviewed the Veteran's service treatment records and/or past medical records, he would have seen that service treatment records are negative for any complaints, diagnoses or treatment of PTSD and that the Veteran specifically denied after he returned from Iraq concerns about possible events that he felt might affect his health. In contrast, Dr. J.B. noted that the Veteran returned from Iraq with PTSD symptoms and nightmares, which is not supported by the contemporaneous evidence of record. If Dr. J.B. reviewed the Veteran's VA records, he would have seen that the Veteran had not been diagnosed by VA with PTSD, as the Veteran reported, and had undergone a comprehensive evaluation for PTSD in June 2006 where he was found not to have PTSD. In addition, because Dr. J.B. did not review the Veteran's prior VA treatment records, he was not aware that the Veteran's reports frequently lacked credibility. Thus, Dr. J.B.'s opinion is of no probative value as it is not based on an accurate past medical history. See Kowalski v. Nicholson, 19 Vet. App. 171, 179 (2005) (reaffirming that in evaluating medical opinion evidence, the Board may reject a medical opinion that is based on facts provided by the veteran if they have been found to be inaccurate or because other facts present in the record contradict the facts provided by the veteran that formed the basis for the opinion); Reonal v. Brown, 5 Vet. App. 458, 460-61 (1993) (indicating that a medical opinion based upon an inaccurate factual premise has no probative value).

In addition, if Dr. J.B. had reviewed the VA records, he would have seen the many inconsistencies and false statements that were in the records. For example, in September 2004, the Veteran reported that he thought he was manic as a kid and should have been put on Ritalin. Then, at a July 2005 VA neuropsychological evaluation the Veteran stated that he was diagnosed in high school with ADHD and placed on Ritalin. In October 2005, the Veteran stated that he was hospitalized for suicidal threats, but that they were false and made because the Veteran had no other place to go. The 2005 VA neuropsychologist found that the Veteran had a tendency to over-report symptoms and throw out all sorts of psychological diagnoses for himself. The Veteran reported at his June 2006 VA examination that he did not see any dead bodies in Iraq, but later reported in July 2006 that he saw dead and burnt bodies.

The probative value of Dr. J.B.'s opinion is further significantly diminished by his findings that the Veteran was not truthful, had difficulty separating fact from hyperbole, and seemed to catastrophize most things in his life; and his knowledge that the Veteran at time employed methods described by his treating physicians as manipulative to achieve what he wanted. For example, the Veteran initially reported that his psychiatric problems began in 1998, but later reported that he did not have psychiatric problems prior to returning from Iraq. In addition, Dr. J.B. made his PTSD diagnosis during an involuntary admission in which the Veteran was committed for stealing to get money for alcohol; such a situation tends to not guarantee truthfulness. Dr. J.B. also knew that the Veteran moved because he stole drugs from a dealer. Dr. J.B. documented that the Veteran was delusional at times or bordered on nonreality thinking, was paranoid, and exhibited strong conspiracy benefits. 

The Board notes that, where there has been an "unequivocal" diagnosis of PTSD by mental health professionals, adjudicators must presume that the diagnosis was made in accordance with the applicable DSM criteria as to both adequacy of symptomatology and sufficiency of the stressor, unless evidence shows to the contrary. Cohen v. Brown, 10 Vet. App. 128, 140 (1997). In the present case, the Board finds that there is ample evidence to question whether Dr. J.B.'s diagnosis of PTSD was made in accordance with the applicable DSM criteria. Dr. J.B.'s records are silent with respect to the particular facts and circumstances of the Veteran's service or any specific stressor. There is no discussion of the DSM criteria or how the Veteran's symptomatology fits within that criteria. The reports are nearly devoid of PTSD symptoms. Only once does Dr. J.B. note that the Veteran had nightmares that seemed to be related to PTSD. In addition, it is unclear the extent to which Dr. J.B. based his diagnosis on the Veteran's inaccurate report that VA had diagnosed him with PTSD. 

Moreover, Dr. J.B.'s records contain absolutely no rationale for how he reached his conclusions or diagnosis of PTSD. Thus, Dr. J.B.'s diagnosis must be afforded no probative weight. Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 301 (2008) (stating that a medical examination report must contain not only clear conclusions with supporting data, but also a reasoned medical explanation connecting the two); see also Stefl v. Nicholson, 21 Vet. App. 120, 124 (2007) ("[A]medical opinion ... must support its conclusion with an analysis that the Board can consider and weigh against contrary opinions."). 

The Board finds it noteworthy that, out of the numerous VA and private practitioners who examined and treated the Veteran, Dr. J.B. is the only one who diagnosed the Veteran with PTSD. Dr. J.B. treated the Veteran for less than one year, from September 2006 to July 2007, and during only four hospitalization. In contrast, VA practitioners treated the Veteran for nearly a decade and during more than a dozen hospitalizations. 

Thus, the Board finds the opinions of the June 2006 and March 2009 VA examiners, who examined the Veteran before and after Dr. J.B. treated the Veteran, to be of greater probative value than Dr. J.B.'s opinion concerning whether the Veteran met the diagnostic criteria for a diagnosis of PTSD. The VA examiners based their opinions on a very thorough review of the Veteran's claims file and evaluation of the Veteran, thoroughly discussed the DSM-IV criteria for a diagnosis of PTSD and whether the Veteran met those criteria, and included adequate rationales for the opinions expressed.

To the extent that the Veteran believes that he currently meets the diagnostic criteria for PTSD, as a lay person, the Veteran has not shown that he has specialized training sufficient to render such a diagnosis. Similarly, the Veteran's mother is competent to report symptoms of mental disorders to the extent that she observed them; however, there is no evidence that she has medical training. Kahana v. Shinseki, 24 Vet. App. 428, 438 (2011). Accordingly, their opinions as to a diagnosis of PTSD are not competent medical evidence, as the diagnosis of complex psychiatric disorders requires medical expertise to determine. See Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007) (noting general competence to testify as to symptoms, but not to provide medical diagnosis). Here, the most probative medical evidence demonstrates that the Veteran does not meet the diagnostic criteria for PTSD. The Board finds the opinions of the VA examiners to be of greater probative value than the lay contentions of the Veteran and his mother.

In sum, after consideration of the lay and medical evidence of record, the Board finds that the most probative medical evidence shows that the Veteran does not meet the diagnostic criteria for PTSD. Accordingly, service connection for PTSD is not warranted. 38 C.F.R. §§ 3.303, 3.304 (2015).

In reaching the conclusion above, the Board has considered the applicability of the benefit of the doubt doctrine. However, as the preponderance of the evidence is against the Veteran's claim, that doctrine is not applicable in the instant appeal. See 38 U.S.C.A. § 5107(b) (West 2014); Ortiz v. Principi, 274 F.3d 1361, 1364 (Fed. Cir. 2001); Gilbert v. Derwinski, 1 Vet. App. 49, 55-57 (1990).

Acquired Psychiatric Disorders Other Than PTSD

For the period on appeal, the Veteran's most frequent diagnoses related to drug and alcohol abuse and dependence, and disorders induced by drugs and alcohol. As discussed earlier, direct service connection may not be granted for disability resulting from a claimant's own drug or alcohol abuse. 38 U.S.C.A. § 105 (West 2014); 38 C.F.R. § 3.301(a) (2015). See also VAOPGCPREC 7-99. 

While alcohol or drug abuse disability acquired as secondary to, or as a symptom of, a service-connected disability can be service connected for compensation, the Veteran is not service-connected for any disorder. Thus, there can be no clear medical evidence that an alcohol or drug abuse disability is secondary to or caused by a primary service-connected disorder, and not due to the Veteran's willful wrongdoing. See Allen v. Principi, 237 F.3d 1368, 1381 (Fed. Cir. 2001). 

Moreover, the Board finds that the evidence shows that the Veteran's alcohol and drug abuse and dependence are the result of his own willful wrongdoing. Although the Veteran reported once at a February 2009 private neuropsychological evaluation that he never drank alcohol before service, the Veteran reported on a June 2005 ASI-Addiction Severity Index that be began using alcohol to intoxication five years earlier. The preponderance of the evidence shows that the Veteran's drug and alcohol use began around 1998, three years prior to service, when his father introduced him to drugs, and continued through service. 

The Board notes that the Veteran alleges that he started abusing analgesics after they were prescribed for him in service following a wisdom tooth extraction and heel injury. However, as noted above, the Board finds that the preponderance of the evidence shows that the Veteran's drug and alcohol use began before service. 
After diagnoses related to drug and alcohol abuse and dependence, the Veteran's diagnoses during the period on appeal fall within the category of psychoses, primarily schizoaffective disorder, including bipolar type. 

The Board finds that there is no credible persuasive evidence that the Veteran's psychosis manifested in service or to a compensable degree within one year of the Veteran's discharge from service in May 2004. See 38 C.F.R. §§ 3.307(a), 3.309(a) (2015). (Parenthetically, the Board also notes that unlike PTSD, the Veteran's other variously diagnosed mental disorders are not disorders the development of which is considered consistent with the circumstances, conditions, or hardships of combat service; therefore, the Veteran is not entitled to the presumption considerations set forth in Reeves v. Shinseki, 682 F.3d 988 (Fed. Cir. 2012)). 

Service treatment records are negative for any complaints, diagnoses, or treatment of any psychosis or mental disorder. The first note of psychotic symptoms is in June 2005, more than a year after discharge. Importantly, the first reliable diagnosis of psychosis is not until June 2006 when the VA examiner diagnosed substance-induced psychotic disorder. See Walker v. Shinseki, 708 F.3d 1331, 1335 (Fed. Cir. 2013). Thus, service connection on a presumptive basis for a chronic disease is not warranted. 

The Board acknowledges the April 2009 assumption of the VA examiner that some schizoaffective disorder was present during the Veteran's military service, but that the symptoms may not have been sufficient to require treatment and the diagnosis was masked by the Veteran's known substance abuse. However, the examiner noted that this opinion was speculative and that he found insufficient evidence to support or refute it. Because the April 2009 opinion is phrased in speculative terms, it lacks substantial probative weight. See Obert v. Brown, 5 Vet. App. 30, 33 (1993) (holding that medical evidence that is speculative, general, or inconclusive cannot be used to support a claim). 

Moreover, to the extent that the April 2009 opinion was based on the Veteran's father being diagnosed with schizophrenia, the opinion was based on unreliable facts and history. In a February 2009 private neuropsychological evaluation, the Veteran reported that he may have a family history of mental illness, as he believed that his father was paranoid, and perhaps schizoaffective. The evidence shows that the notion the Veteran's father was schizophrenic is based on the Veteran's belief, but, as a lay person, the Veteran is not competent to diagnose his father's mental health disorders, and crucially, as detailed above, the Veteran is an unreliable historian. Thus, the April 2009 opinion cannot be construed as persuasive evidence of the onset of a chronic mental disorder during service. 

In regard to continuity of symptoms, the Board finds that the Veteran's psychosis is properly afforded such consideration, as it is one of the enumerated conditions in 38 C.F.R. § 3.309(a). See Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). The Board acknowledges that, since the Veteran was diagnosed with substance-induced psychotic disorder in June 2006, he has intermittently been diagnosed with a variety of psychotic disorders. However, mostly importantly in the present case, there is no medical opinion of record that persuasively links the Veteran's psychosis to his military service. Clyburn v. West, 12 Vet. App. 296, 301 (1999). Thus, due to the finding that there is no credible or probative evidence of psychosis in service and there is no persuasive positive nexus opinion linking the Veteran's psychosis to military service, service connection based on continuity of symptomatology is not warranted either.

The Board acknowledges that the Veteran and his mother state that the Veteran's mental health disorders began in and are due to his military service. It is now well established that lay persons without medical training, such as the Veteran and his mother, are not competent to provide medical opinions on matters requiring medical expertise. See Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007). In this regard, psychosis can have many causes and requires medical evaluation to diagnose and medical expertise to determine its etiology. Although lay persons are competent to provide opinions on some medical issues (see Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011)), the specific issues in this case are medically complex and fall outside the realm of common knowledge of a lay person. See Woehlaert v. Nicholson, 21 Vet. App. 456 (2007) (providing that although the claimant is competent in certain situations to provide a diagnosis of a simple condition such as a broken leg or varicose veins, the claimant is not competent to provide evidence as to more complex medical questions). Thus, the Board finds that neither the Veteran nor his mother is competent to diagnose the onset or cause of his psychosis. 

In sum, after consideration of the lay and medical evidence of record and the lack of a positive persuasive nexus opinion connecting the Veteran's psychosis to his service, the Board finds that the preponderance of the evidence indicates that the Veteran's psychosis was not present in service or within one year after discharge from service, and has not been shown by competent and probative medical evidence to be etiologically related to his active service. Crucially, the Veteran failed to report for the February 2014 examination. Evidence expected from this examination, which might have been material to the outcome of the claim, could not be considered. When a claimant fails to report for an examination scheduled in conjunction with a reopened claim for a benefit which was previously disallowed, the claim shall be denied. 38 C.F.R. § 3.655(b) (2015). Service connection for an acquired psychiatric disorder other than PTSD is not warranted on any basis. See 38 C.F.R. § 3.303, 3.307, 3.309 (2015).

In reaching the conclusions above, the Board has considered the applicability of the benefit of the doubt doctrine. However, as the preponderance of the evidence is against the Veteran's claim, that doctrine is not applicable in the instant appeal. See 38 U.S.C.A. § 5107(b); Ortiz v. Principi, 274 F.3d 1361, 1364 (Fed. Cir. 2001); Gilbert v. Derwinski, 1 Vet. App. 49, 55-57 (1990).



ORDER

Entitlement to service connection for PTSD is denied. 

Entitlement to service connection for an acquired psychiatric disorder other than PTSD is denied.



____________________________________________
TANYA SMITH
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs